UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

_____

| | | |
|---|---|---|
| JOSEPH GOLSON, | ) | C/A No.   4:11-cv-350-CMC-TER |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **Report and Recommendation** |
| | ) | |
| LEROY CARTLEDGE, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |

_____

Petitioner, Joseph Golson (Petitioner/Golson"), is currently incarcerated at McCormick Correctional Institution. Petitioner appearing *pro se*, filed his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254[1] on February 14, 2011. Respondent filed a motion for summary judgment on August 1, 2011, along with a return, supporting memorandum and exhibits. The undersigned issued an order filed August 2, 2011, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Petitioner of the motion for summary judgment procedure and the possible consequences if he failed to respond adequately. (Doc. #29). Petitioner filed a response on September 28, 2011. (Doc. #38).

## PROCEDURAL HISTORY

The procedural history as set forth by the Respondent in his memorandum has not been disputed by the Petitioner. Therefore, the undersigned will set out the undisputed procedural history

_____

[1] This habeas corpus case was automatically referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Rule 19.02 (B)(2)(c), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the district judge.

as set forth by the Respondent, in part.

Petitioner is presently confined in the McCormick Correctional Institution, of the South Carolina Department of Corrections (SCDC), as the result of his Lexington County murder conviction and sentence of life imprisonment. Petitioner was indicted by the Lexington County Grand Jury at the February 1999 term of court for murder in connection with the death of Alice McIver. Petitioner was represented by J. Stephen Welch on this charge in the trial court.

Petitioner received a jury trial before the Honorable Gary E. Clary on May 30-June 1, 2000. The jury found him guilty of murder, and Judge Clary sentenced him to life imprisonment. (App. 1-482; 697-98). Petitioner timely filed and served a notice of appeal. Assistant Appellate Defender Robert M. Dudek represented him on appeal. On September 13, 2001, Petitioner filed his Final Brief of Appellant in which he presented the following issue for review:

> Whether the trial judge misapplied State v. Terry by refusing to allow appellant to cross-examine Officer Johnny Bryant or otherwise place before the jury the fact appellant told Bryant when he was arrested that "we were tussling over the gun and it went off," where the state presented testimony from two other police officers that appellant made statements, within hours of this earlier statement admitting he intentionally shot the victim, but accidently shot her in the chest, since State v. Terry did not abrogate the "rule of completeness," and fairness demanded context be given to these three statements?

Final Brief of Appellant at p. 2. The State filed a Final Brief of Respondent on September 18, 2001. Senior Assistant Attorney General William Edgar Salter, III, represented the State on appeal.

The South Carolina Court of Appeals affirmed Golson's conviction on March 25, 2002.Petitioner timely filed a Petition for Rehearing which the Court of Appeals denied on May 15, 2002.  Petitioner then filed a Petition for Writ of Certiorari to the Court of Appeals on June 13, 2002. The Question presented was as follows:

> Whether the Court of Appeals erred in finding harmless error in the wrongful exclusion of petitioner's statement to arresting officer [sic] that the decedent and he "were tussling" over a gun when it discharged, since this was powerful corroborating evidence of petitioner's trial testimony, and the jury had to be left wondering why petitioner did not tell the responding officer what he testified to at trial?

The State filed a Return to Petition for Writ of Certiorari to the Court of Appeals on July 12, 2002.

The State counter-stated the Question presented and raised two additional grounds:

### COUNTER-STATEMENT OF QUESTION PRESENTED

> Whether the Court of Appeals properly found that any error in the exclusion of Petitioner's statement to the arresting officer that he and the decedent "were tussling over the gun and it went off" was harmless error because (1) Petitioner testified and could have testified about the substance of this statement, (2) the substance of what he wished to get before the jury was already before the jury through Petitioner's trial testimony and the playing of a portion of **Court's Exhibit 1** and (3) there was overwhelming evidence of Petitioner's guilt?

### ADDITIONAL SUSTAINING GROUNDS

> I.   Whether the Court of Appeals erroneously held that Petitioner was entitled to elicit a self-serving hearsay statement made by him through cross-examination of Deputy Bryant, where he did not argue a specific Rule which permitted introduction of this statement in the trial court and the statement was inadmissible under Rule 804(b)(3), SCRE? (Additional Sustaining Ground I).

> II.  Whether assuming *arguendo* that Petitioner's reliance upon Rule 106, SCRE, was not procedurally barred, the Court of Appeals' application thereof, *sub silencio*, was improper?

Return to Petition for Writ of Certiorari, p. 1.

The South Carolina Court of Appeals filed an Order denying certiorari on October 23, 2002. The

Court of Appeals sent the Remittitur to the Lexington County Clerk of Court on October 28, 2002.

3

Petitioner then filed a *pro se* Post-Conviction Relief (PCR) Application on December 30, 2002. He alleged the following grounds for relief in his Application:

    1.    Ineffective assistance of counsel, specifically that counsel failed to investigate and failed to prepare and present a particular defense, and

    2.    Lack of Subject Matter Jurisdiction.

App. pp. 484-91. The State filed its Return and Motion to Dismiss on March 31, 2004. App. pp. 492-96. The State filed an Amended Return on June 14, 2005. App. pp. 499-503.

Petitioner filed an Amendment to Application for Post-Conviction Relief, through Carol A. McCurry, Esquire, on April 7, 2006. In the Amendment, he asserted the additional claim that:

    1.    Counsel was ineffective for failing to call expert witnesses at trial to rebut the State's expert testimony, and for failing to challenge the accuracy and sufficiency of the evidence through a vigorous cross-examination of the State's witness, particularly regarding the trace evidence and forensic pathology issues surrounding the victim's shirt and a contact shot determination that was amended following the autopsy, and particulars about the victim's wound itself that would have supported the Applicant's version of the incident as an accident.

App. pp. 497-98. Petitioner filed "Applicant's Additional Supplement to Original Post Conviction Relief Application," in which he raised the following, additional claim:

    Counsel was ineffective for failing to submit to the jury exculpatory evidence of a 911 call made immediately after the accidental shooting.

App. pp. 504-06.

The Honorable William P. Keesley held an evidentiary hearing into the matter on October 9, 2007, at the Lexington County Courthouse. Golson was present at the hearing and was represented by Ms. McCurry. Assistant Attorney General Daniel E. Grigg represented the State. Petitioner testified on

4

his own behalf. He also presented testimony from trial counsel, Mr. Welsh, as well as testimony from Jeffrey M. Hollifield and Kim A. Collins. App. pp. 507-678.

On October 22, 2007, Judge Keesley filed a Memorandum Order in which he denied relief and dismissed the Application with prejudice. Although he directed the State to file a proposed Order addressing any points not covered by his Order, a subsequent Order was not filed.

Golson timely served and filed a notice of appeal. Assistant Appellate Defender M. Celia Robinson represented him in collateral appellate proceedings. On June, 16, 2008, Golson filed a Petition for Writ of Certiorari and presented seven issues for relief review:

I.    Did the PCR judge err in finding that trial counsel's failure to obtain or present expert testimony in the areas of forensics and trace evidence constituted ineffective assistance of counsel where counsel's failure prejudiced the defense sufficient to undermine confidence in the outcome of the trial?

II.   Did the PCR judge err in finding that trial counsel's failure to present evidence helpful to the defense was not ineffective assistance of counsel?

III.  Did the PCR judge err in finding that trial counsel's failure to present in evidence the 911 tape of Golson's call for help after the shooting was not ineffective assistance of counsel on the basis of his finding that the decision was a tactical decision which was "adequately explained?

IV.   Did the PCR judge err in finding that trial counsel's failure to have a working knowledge of Golson's version of events and his inclusion in his opening statement of statements of fact contrary to Golson's version but confirming the State's theory before the jury did not constitute ineffective assistance of counsel?

V.    Did the PCR judge err in finding that trial counsel was not ineffective in failing to prepare Golson to testify regarding his taped statements and further ineffective in failing to present Golson's statements in context during his direct examination?

VI.   The PCR judge erred in finding that counsel's failure to object to the assistant solicitor's misstatement of the evidence on closing did not constitute

5

ineffective assistance.

VII.   Did the PCR judge err in failing to find that trial counsel was ineffective in failing to argue to the jury that, if not accident, the evidence supported a finding of involuntary manslaughter?

Petition for Writ of Certiorari at p. 2. The State filed a Return to Petition for Writ of Certiorari on September 12, 2008.

The South Carolina Court of Appeals filed an Order denying certiorari on November 23, 2009. Petitioner filed a Petition for Rehearing on December 8, 2009. The Court of Appeals filed an Order denying rehearing on January 20, 2010.

Petitioner thereafter filed a motion for an extension of time with the South Carolina Supreme Court, so that he could file a Petition for Writ of Certiorari in that Court. However, the Supreme Court filed an Order on March 2, 2010, denying his motion as follows: "[i]n *Ellison v. State*, 382 S.C. 189,676 S.E.2d 671 (2009), this Court determined that it will no longer entertain petitions for writs of certiorari where the Court of Appeals has denied a petition for a writ of certiorari in a PCR case. Since this Court will not review this matter, the extension is unnecessary, and the motion for an extension is denied." The Court of Appeals sent the Remittitur to the Lexington County Clerk of Court on March 3, 2010.

## **GROUNDS FOR RELIEF**

In his *pro se* Petition[2] for Writ of Habeas Corpus, Petitioner raises the identical grounds contained in his petition for Writ of Certiorari in state court, which are as follows:

---

[2] In his petition for writ of habeas corpus, Petitioner reasserted in general the identical issues raised in the petition for Writ of Certiorari after his PCR was denied without presenting any argument or other support for the specific issue raised.

6

GROUND ONE:                Ineffective Assistance of Counsel;


SUPPORTING FACTS:

I.      Did the PCR judge err in finding that trial counsel's failure to obtain or present expert testimony in the areas of forensics and trace evidence constituted ineffective assistance of counsel where counsel's failure prejudiced the defense sufficient to undermine confidence in the outcome of the trial?

II.     Did the PCR judge err in finding that trial counsel's failure to present evidence helpful to the defense was not ineffective assistance of counsel?

III.    Did the PCR judge err in finding that trial counsel's failure to present in evidence the 911 tape of Golson's call for help after the shooting was not ineffective assistance of counsel on the basis of his finding that the decision was a tactical decision which was adequately explained?

IV.     Did the PCR judge err in finding that trial counsel's failure to have a working knowledge of Golson's version of events and his inclusion in his opening statement of statements of fact contrary to Golson's version but confirming the State's theory before the jury did not constitute ineffective assistance of counsel?

V.      Did the PCR judge err in finding that trial counsel was not ineffective in failing to prepare Golson to testify regarding his taped statements and further ineffective in failing to present Golson's statements in context during his direct examination?

VI.     The PCR judge erred in finding that counsel's failure to object to the assistant solicitor's misstatement of the evidence on closing did not constitute ineffective assistance.

VII.    Did the PCR judge err in failing to find that trial counsel was ineffective in failing to argue to the jury that, if not accident, the evidence supported a finding of involuntary manslaughter?

(Petition).


## SUMMARY JUDGMENT

7

The federal court is charged with liberally construing the complaints filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972). The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Dep't of Social Servs., 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c).

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to

defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir.

1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would

apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere

allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper

summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule

56(c), except the mere pleadings themselves).  Rather, the party must present evidence supporting

his or her position through "depositions, answers to interrogatories, and admissions on file, together

with . . . affidavits, if any." Id. at 322; see also Cray Communications, Inc. v. Novatel Computer

Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local

Rules 7.04, 7.05, D.S.C.

## STANDARD OF REVIEW

In addition to the standard that the court must employ in considering motions for summary

judgment, the court must also consider the petition under the requirements set forth in 28 U.S.C. §

2254. Under § 2254(d),

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in the
> State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the State court proceeding.

9

Thus, a writ may be granted if a state court "identifies the correct principle from [the Supreme] Court's decisions but unreasonably applies that principle of law" to the facts of the case. Humphries v. Ozmint, 397 F.3d 206, 216 (4th Cir. 2005) (citing Williams v. Taylor, 529 U.S. 362, 413 (2000)). However, "an 'unreasonable application of federal law is different from an incorrect application of federal law,' because an incorrect application of federal law is not, in all instances, objectively unreasonable." Id.    "Thus, to grant [a] habeas petition, [the court] must conclude that the state court's adjudication of his claims was not only incorrect, but that it was objectively unreasonable." McHone v. Polk, 392 F.3d 691, 719 (4th Cir. 2004). Further, factual findings "made by a State court shall be presumed to be correct," and a Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).


## PROCEDURAL BAR

### A.  Exhaustion and Procedural Bypass

The doctrines of exhaustion and procedural bypass can bar a federal habeas claim if a petitioner has not first submitted his claims for relief to the state courts.  Generally, pursuant to the exhaustion doctrine[3], a habeas petitioner will be procedurally barred from bringing a federal habeas claim if the claim has not first been presented to the state's highest court with authority to decide

---

[3]  As stated by the Supreme Court:

> The exhaustion doctrine existed long before its codification by Congress in 1948. In Ex parte Royall, 117 U.S. 241,251 (1886), this Court wrote that as a matter of comity, federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act . . .

Rose v. Lundy, 455 U.S. 509, 515 (1982).

the issue.  <u>See</u> 28 U.S.C. §2254[4]; <u>Rose v. Lundy</u>, 455 U.S. 509, 515 (1982).

In South Carolina, a person in custody has two primary means of attacking the validity of his conviction.  The first avenue is through a direct appeal and, pursuant to state law, he is required to state all his grounds in that appeal. <u>See</u> SCAR 207; <u>Blakeley v. Rabon</u>, 266 S.C. 68,221 S.E.2d 767 (1976). The second avenue of relief is by filing an application for post-conviction relief (PCR). <u>See</u> S.C. Code Ann.§17-27-10 et seq. A PCR applicant is also required to state all of his grounds for relief in his application. <u>See</u> S. C. Code Ann. § 17-27-90. Strict time deadlines govern direct appeal

---

[4]  §2254(b) and (c) read as follows:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court, shall not be granted unless it appears that

> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(I) there is either an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process, ineffective to protect the rights of the applicant.

(2)     An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3)     A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c)     An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

and the filing of a PCR in the South Carolina Courts.

When the petition for habeas relief is filed in the federal court, a petitioner may present only those issues which were presented to the South Carolina Supreme Court through direct appeal or through an appeal from the denial of the PCR application, whether or not the Supreme Court actually reached the merits of the claim. If any avenue of state relief is still available, the petitioner must present the issue to the state court before requesting a writ of habeas corpus in the federal courts. See Rose, 455 U.S. at 515; Richardson v. Turner, 716 F.2d 1059 (4th Cir. 1983); Patterson v. Leeke, 556 F.2d 1168 (4th Cir. 1977).

If a petitioner fails to raise a claim at the appropriate time in state court and state procedural rules bar further means of presenting the issue to the state courts, the claims is procedurally bypassed and, generally, is procedurally barred from federal habeas review.  Smith v. Murray, 477 U.S. 527, 533 (1986).

Federal courts have jurisdiction to consider habeas claims subject to procedural bar (through exhaustion or procedural bypass); however,

> . . . the exercise of that power ordinarily is inappropriate unless the defendant succeeds in showing both "cause" for noncompliance with the state rule and "actual prejudice" resulting from the alleged constitutional violation.

Smith v. Murray, 477 U.S. 533 (quoting Wainwright v. Syke s, 433 U.S. at 84 (1977)). See also Engle v. Isaac, 456 U.S. 107, 135 (1982).

B.  Cause and Actual Prejudice

In order to have such claims considered, a petitioner must show sufficient cause for failure to raise the claim and actual prejudice resulting from the failure,  Coleman v. Thompson, 501 U.S. at 750, or that a "fundamental miscarriage of justice" has occurred. Murray v. Carrier, 477 U.S. 478

(1986). A petitioner may prove cause if he can demonstrate ineffective assistance of counsel relating to the default, show an external factor which hindered compliance with the state procedural rule, or demonstrate the novelty of a particular claim. Murray v. Carrier, 477 U.S. 478 (1986); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), cert. denied, 499 U.S. 913 (1991); and Clanton v. Muncy, 845 F.2d 1238 (4th Cir. 1988), cert. denied, 485 U.S. 1000 (1988).

If a petitioner fails to show "cause," the court is not required to consider "actual prejudice." Turner v. Jabe, 58 F.3d 924 (4th Cir. 1995). However, if a petitioner demonstrates sufficient cause, he must also show actual prejudice in order to excuse a default. Murray v. Carrier, 477 U.S. at 492. To show actual prejudice, the petitioner must demonstrate more than plain error. He is required to prove that specific errors infected the trial and were of constitutional dimensions. United States v. Frady, 456 U.S. 152 (1982).

In Kornahrens v. Evatt, 66 F.3d 1350 (4th Cir. 1995), the Court of Appeals stated that once a claim is determined to be procedurally barred, the court should not consider the issue on its merits. The Court noted that it is always tempting to discuss the merits as an alternative reason for a conclusion, but that once a court finds an issue to be procedurally barred, all discussion which follows is only dicta. See Karsten v. Kaiser Foundation Health Plan, 36 F.3d 8, 11 (4th Cir. 1993). Once a court has determined that a claim is procedurally barred, it should not stray into other considerations.

## DISCUSSION AS TO STATUTE OF LIMITATIONS

The Respondent asserts that the Petitioner's claims must be dismissed as untimely. Specifically, Respondent asserts that the Petitioner's federal habeas petition should be dismissed

because it was not timely filed under the one-year statute of limitations created by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Petitioner filed a response in opposition.[5]

The applicable law is as follows: The AEDPA became effective on April 24, 1996. The AEDPA substantially modified procedures for consideration of habeas corpus petitions of state inmates in the federal courts. One of those changes was the amendment of 28 U.S.C. § 2244 to

---

[5] In his response in opposition to the motion for summary judgment, Petitioner asserts he is entitled to counsel because he has a learning disability and is only able to read at a 5th grade level. Petitioner submitted some medical records showing he has a back problems and diabetes, and a sheet with test results from September 7, 2011, showing that he had a reading grade equivalent to fifth grade. (Doc. #38-3). However, it is not clear where the test was performed. (See response Doc. #38-2). At PCR, Counsel was asked if he was aware that Petitioner could not read or write. Counsel testified that he was aware that he had some difficulty reading and writing. Counsel testified as follows:

> Number one, yes, ma"am, he was competent, able to assist in what was going on. Joe and I had some long talks about a lot of things besides this case. We also, I have in my criminal defense clients sometimes—it's not unusual for people to have difficulty in reading and writing. So we're very careful to make sure if we go over something that we try to read portions out loud that may be relevant.

App. p. 554.

In the PCR Order, the PCR judge stated the following:

> PCR counsel stated that Mr. Golson suffers from some learning disabilities. If that is true, it clearly is not obvious from his appearance, demeanor, or his answers to questions. The court found him to be articulate, and he never gave the court any indication that he lacked understanding of the proceedings.

App. p. 693.

14

establish a one-year statute of limitations for filing habeas petitions.[6]  Subsection (d) of the statute

now reads:

> (d)(1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the <u>latest</u> of–
>
>> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2)  The time during which a "properly filed" application for State post- conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection. (Emphasis added).

As stated under the procedural history, Petitioner was convicted in June 2000, and filed and served

a timely Notice of Appeal.  The South Carolina Court of Appeals affirmed the conviction and

dismissed his appeal. Petitioner filed for a Petition for Rehearing which the South Carolina Court

---

[6] Prior to this amendment there was no statute of limitations.  Habeas Rule 9(a) allowed dismissal only where the state could show it had been prejudiced by a delay in filing.  <u>Duarte v. Hershberger</u>, 947 F. Supp. 146, 148, n.2 (D.N.J. 1996).

of Appeals denied on May 15, 2002. Petitioner filed a Petition for Writ of Certiorari and the South Carolina Supreme Court filed an Order denying certiorari on October 23, 2002. The Remittitur was sent to the Lexington County Clerk of Court on October 28, 2002. The one-year limitations period began running on this date to file his federal habeas corpus action unless the period was at any time tolled. See, e.g., Brown v. Angelone, 150 F.3d 370 (4th Cir. 1998).

Petitioner filed a PCR application on December 30, 2002.  The period of limitations for filing his federal habeas corpus action was tolled during the pendency of the PCR.  An Order of Dismissal was filed on October 22, 2007, dismissing the PCR application. The South Carolina Court of Appeals filed an Order denying certiorari on November 23, 2009. The Remittitur was issued by the South Carolina Court of Appeals on March 3, 2010, after the South Carolina Supreme Court entered an order denying his motion for extension of time of file a Petition for Writ of Certiorari. Petitioner filed this habeas petition on February 14, 2011, with a Houston v. Lack, supra, delivery date of February 10, 2011. Using the date of February 10, 2011, there were at least four hundred six (406) days of non-tolled time since the Petitioner's one-year limitations period began to run *if* the 90-day time period to file a petition for writ of certiorari in the United States Supreme Court does not toll the statute. However, The Fourth Circuit has not clearly ruled on this issue.

Since Petitioner filed a direct appeal, the ninety (90) day period for seeking certiorari from the United States Supreme Court is included. *See e.g.,* Gonzalez v. Thaler, 132 S.Ct. 641 (2012); 28 U.S.C. § 1257 [United States Supreme Court can only review on certiorari the final judgments of "highest court of a state"]; Harris v. Hutchinson, 209 F.3d 325 (4th Cir.2000) (direct review concludes at expiration of time for seeking certiorari from United States Supreme Court); U.S. Sup.Ct. R. 13(1) (time for filing petition for certiorari with United States Supreme Court is 90 days).

28 U.S.C. §1257(a) states as follows:

>   **(a)**     Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

28 U.S.C.A. §1257(a).

Based on case law as cited above, the Petitioner is entitled to the ninety (90) day period for seeking certiorari from the United States Supreme Court so that his case is not barred by the statute of limitations.[7] Therefore, the undersigned will address the merits that have been properly presented for review.

## FACTUAL BACKGROUND

Petitioner was found guilty of murdering Alice McIver ("Victim"), his girlfriend, on October 4, 1998. The victim died from bleeding caused by a gunshot wound to her chest which was inflicted from a high-powered rifle. The victim was in her bedroom when the shooting occurred and the only other person known to be there was Petitioner, Joseph (Bubba) Golson, who was married to someone else while being involved in a romantic relationship with the victim. The rifle had been a gift from the victim. In the PCR court's order of dismissal, the court set out a very lengthy factual background. A portion of the background is set out herein, quoted verbatim:

---

[7] Additionally, in <u>Oregon v. Guzek</u>, 546 U.S. 517, (2006), the United States Supreme Court held that "[w]e possess jurisdiction to review state-court determinations that rest upon federal law." <u>Id</u>. at 521.

The victim was found face up on her bed. She was wearing panties, but no other clothing. There was a large pool of blood on the bed. Her body had been moved to some extent by Mr. Golson after the shooting, but before law enforcement officials arrived. A blood-soaked T-shirt was on the bedroom floor, and it had two holes in it-one being a large tear that would have been directly over the hole in Mrs. McIver's chest had it been on her. The body was covered with the bed comforter up to the victim's neck.

Various other items were on the bedroom floor, including the rifle, six unspent cartridges, one spent casing, and a black bag. A diagram used at trial listed the black bag as a purse, but the applicant now asserts that the bag was a small suitcase.

An autopsy was conducted on the victim's body. A single gunshot wound was present with the entrance being in the center of her upper chest, entering from an angle going left to right. It went through a lung, part of her heart, and exited on her right side. The projectile then entered M[s] McIver's inner arm and exited through the other side near her elbow. The bullet was recovered.

A 911 call was placed. In it, the applicant stated that the shooting was accidental. He claims that he went to the home that evening to break [off] the relationship-something he claims that he and Mrs. McIver had discussed. The 911 tape was not entered into evidence.

Mr. Golson was a truck driver and operated an 18-wheel tractor-trailer rig. That evening, he parked his truck at someone else's home and walked to the victim's home. There was testimony that the Hayden home, where the truck was parked that night, was 0.8 miles by road from the victim's home and that the home was less visible from a main road. There was also testimony that the distance was shorter if a person walked through a pasture and not along the roads.

Ryan Hayden lives at the residence where the truck was parked. He testified at trial that he was at home asleep and that he was awakened between 11:30 p.m. and 12:30 a.m. by someone knocking on the door. He did not go to the door until after the knocking stopped. He looked out the window and saw a man in a white shirt and what appeared to be blue jeans "running up the driveway." Mr. Hayden testified that about an hour later he got a call from the applicant, whom he knew. Mr. Hayden said that he could tell by Mr. Golson's voice that "something was wrong." He said that Mr. Golson told him that the truck was parked in Mr. Hayden's yard and that Mr. Golson wanted to know if that was okay. Mr. Hayden said that Mr. Golson had not parked his truck there before, that Mr. Golson said "there was some things going on," and that, while all of that seemed odd, Mr. Hayden indicated that it was fine to leave

the truck there. Mr. Hayden then went back to sleep.

Mrs. Billie Jean Elmore testified at trial that she had known Mrs. McIver for decades, having formerly been related by marriage. When the victim had lost a previous home to fire, both the victim and the applicant had lived with Mrs. Elmore until the applicant bought the small mobile home for the victim. Mrs. McIver and Mrs. Elmore were very close friends, seeing each other often and speaking on the phone frequently. They had gone together to a steakhouse that night. After dinner, when the victim and Mrs. Elmore returned to Mrs. Elmore's home, they talked until about 11:30 p.m. The victim then left to go to her home. Mrs. Elmore testified that Mrs. McIver called about midnight and said that "Bubba is here. He has been waiting on me." According to Mrs. Elmore, the victim asked her to tell Mr. Golson that they had been together at dinner and that Mr. Golson was always jealous and accused the victim of seeing other people. Mrs. Elmore claims, in response to the victim's request, she heard Mr. Golson say "She ain't going to do nothing but lie for you." After talking a little while longer, the telephone conversation ended.

Mr. Golson testified at trial completely differently regarding that telephone conversation. He said that he was in the bathroom, but able to hear what the victim was saying. He said that Mrs. Elmore's washing machine was not draining properly and that the victim asked him what Mrs. Elmore should do. He said that he told the victim to tell Mrs. Elmore to check around the drum for articles of clothing that might be trapped.

Mrs. Elmore testified that Mr. Golson typically parked his truck at the back of Mrs. McIver's mobile home. The home fronted on Highway 6. Mrs. Elmore said that the victim hated guns, that the victim did not keep guns in her home because she had grandchildren who came over, and that the rifle was kept by Mr. Golson in his truck. Mr. Golson testified that the gun was kept in a closet in the bedroom between some linens and that Mrs. McIver got the rifle from the closet that night. Mrs. Elmore said on cross-examination that she did not go into Mrs. McIver's closet.

There was damage done to the door frame area in the bedroom. Mrs. [Elmore] said that she had never observed any damage to that door, though she visited the home frequently. On cross- examination, it was brought out that damage to the door would have been concealed unless viewed from inside the bedroom.

When the deputies arrived, they first went to the perimeter of the property to secure the area. Mr. Golson drove up in his truck. He had left the home on foot after the shooting and retrieved his truck. He testified that he had parked his truck at the other residence because he did not want his children following him, which they had done

19

before. Mr. Golson's wife knew about the long-term adulterous affair that he had with the victim.

Master Deputy Bryant (now Sergeant Bryant) talked to Mr. Golson when he arrived. Mr. Golson was wearing a white shirt and blue jeans. Within minutes of the conversation, Sergeant Bryant placed the applicant under arrest, gave Miranda warnings, and put him in a patrol car.

Deputies Snead, Day, and Fugate (now McCann) entered the residence. Deputy Snead testified that he observed what appeared to be a crack in the structure of the bedroom doorway. Looking into the bedroom, he saw the victim in the bed with a comforter over her. He checked her pulse by touching her neck and observed to see if she was breathing. Seeing no sign of life, he backed out of the room. He noticed a large pool of blood, a rifle on the floor (that he said was open-levered), and one spent cartridge casing. Emergency Medical Technicians (EMTs) were allowed to enter the bedroom. Then, a crime scene investigator arrived on the scene.

Deputy Snead went outside. Mr. Golson had been placed into Deputy Snead's cruiser, so the deputy started the vehicle so that the air conditioner would be running for Mr. Golson. When the vehicle is running, a videotaping machine automatically comes on. Mr. Golson was inside that vehicle at the scene for about an hour and a half. The audio portion of the videotape captured things that Mr. Golson said to himself.

(App. pp. 682-684).

## ANALYSIS
### Ineffective Assistance of Counsel

Petitioner raised ineffective assistance of trial counsel as Ground One in his habeas petition with seven subsections as supporting facts. These subsections will be referred to as Issues I-VII. The law related to claims of ineffective assistance of counsel will first be addressed followed by a discussion of each subsection as it pertains to this law.

When presented with an application for habeas relief, the first inquiry by the court is to determine whether the claim raised in the petition was "adjudicated on the merits" by the state court.

20

28 U.S.C.A. §2254(d). If the claim was properly presented to the state court and the state court adjudicated it, the deferential standard of review set forth in §2254(d) applies and federal habeas corpus relief may not be granted unless the relevant state-court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. § 2254(d)(1),(2); see Williams v. Taylor, 529 U.S. at 398.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel in a criminal prosecution. McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). In the case of Strickland , supra, the United States Supreme Court set forth two factors that must be considered in evaluating claims for ineffective assistance of counsel. A petitioner must first show that his counsel committed error. If an error can be shown, the court must consider whether the commission of an error resulted in prejudice to the defendant.

To meet the first requirement, "[t]he defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Turner v. Bass, 753 F.2d 342, 348 (4th Cir. 1985) (quoting Strickland, reversed on other grounds, 476 U.S. 28 (1986)). In meeting the second prong of the inquiry, a complaining defendant must show that he was prejudiced before being entitled to reversal. Strickland requires that:

> [T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, at 694.

The court further held at page 695 that:

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct . . . the court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  (Emphasis added.)

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000), *quoting* Strickland at 694, the Court held that "[to] establish ineffectiveness, he [a defendant] 'must show that counsel's representation fell below an objective standard of reasonableness, and to establish prejudice he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Thus, the Court confirmed that the correct standard for judging ineffective assistance of claims is the Strickland standard.

## **ISSUE I**

In Issue I, Petitioner asserts trial counsel was ineffective for failing to obtain or present expert testimony in the areas of forensic pathology and trace evidence.  Respondent asserts that state PCR court's factual findings are not objectively unreasonable and was "not contrary to" and did not involve an "unreasonable application" of clearly established law.

The PCR judge concluded the following with regard to this issue of ineffective assistance of counsel:

As to the challenges related to counsel's performance during the trial, the court has carefully reviewed the record and determined that counsel's performance was well within the range of reasonable representation. He provided effective assistance concerning how and why he presented evidence, as well as how and why he attacked the State's presentation of evidence. His testimony about tactical decisions that he made was reasonable and credible.

Mr. Golson claims that trial counsel failed to fully investigate the case. He asserts that trial counsel did not obtain expert witnesses and failed to present expert opinions and other evidence that would have corroborated applicant's version of what occurred. . . .

The only one of those issues that causes the court any pause is the one related to obtaining and presenting expert testimony.

App. pp. 690-91. He then made the following findings about counsel's cross-examination of

prosecution witnesses:

He did conduct a vigorous cross examination, and on numerous occasions he elicited information from the State's witnesses that was helpful to his client. For example, he had them testify that the applicant did not run away, but actually retrieved his truck and drove back to the scene. He had them testify about evidence found at the scene, such as unspent cartridges, that tended to corroborate his client's version of events. He did not know about the applicant's clothes being in the bag that was in the picture, and the client never told him that the bag was his suitcase. Counsel's conduct related to that item was reasonable. Concerning damage to the door of the bedroom that the State claimed was evidence that the applicant broke into the room where the shooting took place, he elicited testimony that the damage could have been preexisting. Concerning the phone call that the victim made to Ms. Billie Elmore, which the State used as evidence about a dispute between the applicant and the victim - as well as evidence of jealousy and perhaps lying in wait - trial counsel got Ms. Elmore to characterize the phone call as a routine type of call - a normal event and not a cause for alarm. The State's firearms expert testified that the gun could have accidentally discharged in a struggle. And, counsel elicited testimony from State's witnesses that the applicant repeatedly referred to the shooting as an accident,

though the State's witnesses at trial often tried to put a different spin on those statements. Trial counsel did an admirable job of pointing out inconsistencies between the testimony about those statements and the way those statements were recorded in written documents made at a time more contemporaneous with the shooting.

. . .

The only issue the court finds to be of concern is the failure to hire expert witnesses. In the amended PCR application, it is alleged that trial counsel was ineffective for failing to call expert witnesses at trial to rebut the State's expert testimony and for failing to challenge the accuracy and sufficiency of the evidence, particularly trace evidence and forensic evidence about the victim's shirt and her wound. It is asserted that the development and presentation of such evidence would have supported the applicant's version of events.

At the PCR hearing, a forensic pathologist, Dr. Kim Collins, and a trace evidence expert, Jeffrey M. Hollifield, testified on behalf of the applicant.

Dr. Collins is well qualified and is an impressive witness. She thoroughly reviewed the record, including the autopsy results. Basically, the only thing that Dr. Collins challenged about Dr. Sexton's testimony was his conclusion that this was a distant gunshot wound. In the trial, Dr. Sexton testified that he examined the victim's T-shirt grossly and did not see any evidence of soot, tattooing, or other markers to indicate that this was a contact wound. He testified that he forwarded the shirt to SLED, which would be responsible for conducting more thorough testing. He agreed when asked by trial counsel if the best way to determine the distance between the end of the gun barrel and the wound would be by conducting test firings. Trial counsel then said in a question that test firings were not done, and Dr. Sexton responded that he did not know. Dr. Collins agreed that Dr. Sexton had acted appropriately when he indicated that the pathologist would look at the T-shirt, but not conduct forensic tests on it, and she agreed that he acted properly in forwarding the shirt to SLED.

Mr. Hollifield provided testimony about test firings. He obtained some of the actual unspent cartridges in this case. He bought others

24

that are similar. Various test shots were done on T-shirts and pieces of cloth, and the tearing pattern that was most similar to the one present on the victim's T-shirt was a contact wound at a 30 degree angle. The applicant maintains that this supports his position that the victim was pulling on the gun barrel and that it accidentally discharged while he was attempting to eject the cartridges from the weapon.

All of this information clearly could have been obtained prior to the trial. It was not. Applicant asserts that this was ineffective assistance of counsel.

In response, trial counsel testified that he was retained by Mr. Golson. Mr. Golson testified that he was in bankruptcy during all relevant times and that trial counsel knew it. Trial counsel admitted that he knew; but, he said that Mr. Golson had gotten out on bond and was working in his normal occupation as a truck driver. Mr. Golson owned property. He was not in the type of bankruptcy that would force liquidation of his assets. Trial counsel testified credibly that he discussed with his client the need for an expert. He even had the name of a retired SLED agent that he wanted to use. He told his client that the client could apply for a Public Defender, but the client rejected that suggestion, and trial counsel did not believe that Mr. Golson would qualify for indigent status because of his income and assets. While trial counsel never specifically discussed with his client the ability to seek funds from Indigent Defense for payment of experts, he told his client that the client may need to sell something or borrow from his family to get the funds for experts.

Mr. Golson testified on PCR that he may have paid about $7,000 to the attorney, which was far less than the quoted fee. Trial counsel testified that the quoted fee was $25,000, and he received about $4,000. He testified that he told his client that he would not abandon him if [Golson] was unable to pay the rest of the fee.

It is troubling to the court that the information of the trace expert witness concerning test firings was not presented to the jury. While the court has questions about the methodology, (specifically about whether and to what extent the tests would be affected by what was underneath the cloth), the evidence from the trace expert could be extremely significant to the determination of the distance between

25

end of the gun barrel and the wound. In the court's view, however, that is not the determining factor in this PCR application.

The trial attorney told his client that an expert was needed. The trial attorney clearly knew about the significance of test firings, because the transcript reflects that he asked Dr. Sexton that exact question. The client did not advance the funds to hire the expert and trial counsel proceeded to do the best that he could. It has not been established that the applicant would have been entitled to funding for expert witnesses through Indigent Defense. In fact, the opposite appears to be true.

Though this may be a very harsh result, the court does not believe that it is grounds for PCR to complain of the lack of expert testimony when trial counsel told the applicant about the need for such and the applicant failed to follow through in helping to secure it. There has not been a sufficient showing that the testimony of an independent forensic pathologist was necessary in this case. The closer question relates to a trace evidence expert. It is conceded by the court that if there had been test firings, it would have been possible to question Dr. Sexton about those results. To the extent that there has been a showing that there was a need for the testimony of someone qualified to conduct test firings and render opinions, there has not been a showing that the failure to do so in this case amounted to ineffective assistance of counsel. Trial counsel made a reasonable effort.

Moreover, the applicant must show that the presentation of that evidence would be likely to change the outcome of the trial. Here, the exact location of the end of the gun barrel does not appear to be determinative of whether or not this was murder. It does not establish that this was an accidental discharge of the weapon or establish that it is likely that the jury would have reached a different conclusion. The court does not find that the applicant has met the prejudice prong as it relates to this or any other issue.

App. pp. 691, 693-96.

At PCR, Petitioner had Dr. Collins, a pathologist, testify on his behalf. Dr. Collins

challenged Dr. Sexton's testimony that it was a distant gunshot wound. Dr. Collins testified that it

was not possible to determine the distance of the weapon from a wound if there was an intermediate target such as clothing because it can become very confusing. Dr. Collins testified that the victim's wound was "most certainly not inconsistent with a contact shot." App. pp. 631-632. Basically, Dr. Collins agreed that Dr. Sexton acted appropriately and that the only issue she appears to disagree with is that she would not have classified the fatal shot as a distant gunshot wound.

Petitioner also called David Hollifield, an expert in trace evidence, to testify at the PCR hearing. Hollifield testified that after conducting test firings with the unspent cartridges ejected from the weapon found at the scene, the tearing pattern that was most similar to the one present on the victim's T-shirt was a contact wound at a thirty-degree angle. (App. 637-38, 650-659). Hollifield also testified to the results from his testing of Petitioner and the victim for gunpowder residue. Hollifield testified that "no gunshot residue was found. In other words, the test was completely negative. For the victim, McIver, they say the quantities of metals detected do not indicate presence of gun primer." (App. pp. 641-47). Thus, based on Hollifield's testimony, some metals were detected on the victim but the amount was not sufficient to determine for certain they were from gun primer, and the tests performed on Petitioner and victim were different and should not be compared. Id.

The PCR court's rejection of the ineffective assistance of counsel ground for relief was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(1), (2); Williams, supra. The PCR court found counsel's testimony credible. At the PCR hearing, Counsel testified that while Petitioner was in bankruptcy during the

relevant time, Petitioner was not indigent at the time because he had a job as a truck driver and owned his own home and owned the truck. Trial counsel testified that he discussed with Petitioner the need for an expert and had the name of a retired SLED agent he wanted to use. Trial counsel testified that "[a]nd I also, from the very beginning, I tried to get the family to hire an expert witness. I actually had one that I had retained, talked to them about the cost. I told them that expert testimony in situation like this. [sic]. In fact, the gentleman's name was James A. Screens, retired SLED forensic service laboratory, 28 years. He was located in Chapin which was close. And actually had agreed to not work for a reduced fee but he'd understand that money was a problem." (App. p. 549). Even though trial counsel testified that he did not discuss the possibility of having him declared indigent and seeking compensation and funding for an expert from the Office of Indigent Defense, he did testify that he was of the opinion that he would not qualify based on his financial condition. Additionally, there is nothing in the record that Petitioner would have qualified for expert fees through the indigent defense. Also, Counsel testified that he discussed with Petitioner "letting the public defender basically come in, take over the case and could get some expert testimony that way" but he refused. (App. p. 550). Counsel further testified that he ". . . discussed with Joe that, in terms of what he could do. He could, in fact for the fee that this expert was going to charge, I forget what it was, I told Joe if he had to, you know, sell something, borrow money from family, that that's what he needed to do." Id. A presumption of correctness attaches to state court factual findings. 28 U.S.C. §2244(e)(1). Evans v. Smith, supra; Wilson v. Moore, supra. The state PCR court's findings of fact are not only entitled to the presumption of correctness, 28 U.S.C. § 2254(e)(1), but also are supported by the record. Thus, PCR courts finding of no attorney error is neither contrary to, nor involved an unreasonable application of, clearly established federal law and this court must defer

28

to it. 28 U.S.C. § 2254(d)(1); Williams v. Taylor, supra.

Even assuming, *arguendo,* that Petitioner's counsel was did commit error with respect to the issue of presenting expert testimony, Petitioner has not shown prejudice based on the testimony of the experts at PCR with regard to this issue.  As previously stated, upon cross-examination, counsel was able to get Dr. Sexton to testify that he did not know whether or not the gun was fired accidentally, the weapon could have been as close as 18" to the victim when discharged, and that he could not rule out that the victim had her hand on the weapon when it discharged. Further, Dr. Sexton testified upon cross-examination that the best way to determine the distance between the end of the gun barrel and the wound would be by conducting test firings which Dr. Sexton did not conduct and did not know if test firings were done by anyone else. App. pp. 267, 269-271, 277-281. Petitioner had Hollifield, a trace evidence expert, testify at the PCR hearing that he conducted test firings and that based on the tearing pattern most similar to the victim's T–shirt, it was a contact wound at a 30-degree angle. However,  Hollified also testified that there was no gunshot residue on the victim's hands which would have undermined Petitioner's testimony and defense that the victim had her hand on the end of the barrel when the gun discharged. She also testified that it could have been from 18 inches to three feet but test firing would need to be done. Dr. Collins admitted that Dr. Sexton testified that the gunshot wound could have been as close as 18 inches. App. pp. 620-621, 635. Therefore, while Dr. Collins testimony at PCR challenged Dr. Sexton's testimony and conclusions that it was a distant gunshot wound, she testified that the gunshot  was of indeterminate range because clothing [in this case, the victim's T-shirt that was soaked in blood] acts as an intermediary target. App. pp. 619-620. As previously set forth, the PCR judge found that: "[h]ere, the exact location of the end of the gun barrel does not appear to be determinative of whether or not

this was murder. It does not establish that this was an accidental discharge of the weapon or establish that it is likely that the jury would have reached a different conclusion. The court does not find that the applicant has met the prejudice prong as it relates to this or any other issue." App. p. 696. The state PCR court's findings of fact are not only entitled to the presumption of correctness, 28 U.S.C. § 2254(e)(1), but also are supported by the record. Further, based on the above, those findings is neither contrary to, nor involved an unreasonable application of, clearly established federal law and this court must defer to it. 28 U.S.C. § 2254(d)(1); Williams v. Taylor, supra. Accordingly, the undersigned recommends that Respondents' motion for summary judgment be granted with respect to Issue One.

**ISSUE II**:

In Issue II, Petitioner asserts the following: "Did the PCR judge err in finding that trial counsel's failure to present evidence helpful to the defense was not ineffective assistance of counsel?" Petitioner argues trial counsel erred in failing to call Deputy Coronor Todd Caughman and Sled Agents David Black and Dorothy Fuller as defense witnesses, and failed to adequately cross-examine Dr. Sexton.

Respondent argues that the state court's factual findings are not objectively unreasonable and the state PCR court's rejection of the ineffective assistance of counsel claim based upon a failure to prove prejudice was not "contrary to"and did not involve an "unreasonable application of" clearly established United States Supreme Court precedent under §2254(d)(1). (Respondent's memorandum, p. 50).

At PCR, Petitioner introduced SLED Agent Black's report in which she concluded she found no finger prints on the gun. Further, Petitioner asserts counsel should have called SLED Agent

Fuller to testify that she tested the victim's T-shirt and initially opined it was a contact wound. Petitioner argues that trial counsel should have called Coroner Caughman to testify about the distance of the gun barrel from the entry wound at the time the gun was fired. At trial, counsel attempted to have Dr. Sexton testify to information in Mr. Caughman's report but the state objected because Dr. Sexton testified he had not seen the report. When counsel attempted to cross-examine Dr. Sexton with regard to testing by Agent Fuller, the trial judge did not allow him to pursue the questioning since SLED agent Fuller had not testified. (App. pp. 271-277).

At the PCR hearing, trial counsel testified as follows when questioned that since he tried to elicit testimony from Dr. Sexton with regard to Deputy Coroner Caughman's report indicating  it could have been a close-contact wound, did he think it was important:

> Anything that would, the closer the gun is to the victim in Mr. Golson's case, then the better off he would be in terms of his defense that it was an accident. That she actually was pulling on one end of the gun while he was trying to get shells out . . . It was important but not enough to put a county employee on the stand.

(App. p. 591). Counsel testified that had the state called Mr. Caughman, he would have cross-examined him about the report.

As to David Black, the SLED agent who did fingerprint analysis on the gun, trial counsel was asked "[d]o you think it would have been important to let the jury know that there were no fingerprints on the gun of Mr. Golson or the deceased?" (App. p. 592). Trial counsel responded that it would not be important that there were no fingerprints on the gun of Petitioner or the deceased testifying as follows:

> . . . I would want fingerprints on the gun of both of them. Mr. Golson's testimony was that she had one end of the gun, he had the other and he was trying to ratch the bullets out before it could be fired . . .  and so I wish that her fingerprints had been

31

on the barrel of the gun. That would have been wonderful. . . well, you asked me about why did I not put into evidence that there were no fingerprints on the gun. I want fingerprints on the gun. Why would I put into evidence they're not there?

App. pp. 591-592.

Counsel further testified:

Well, number one, this is a SLED agent. And in terms of me putting a SLED agent up in my case in chief, there's an old defense saying that good SLED agents and FBI is kind of like skunk. It's hard to get around them without getting a little something on you.

So I'm not going to put a SLED agent up simply to testify that he didn't find any fingerprints because he will find something else to say on the cross-examination that hurts me. Murder cases, when you - - especially in the defense case, that's some of the last evidence the jury hears . . .  Ma'am, I think that it would have been negligent of me to put up a SLED agent in my case in chief to testify that he found no fingerprints of her either, because that would not have been all the testimony.

App. pp. 593-594.

As to why Counsel did not call SLED agent Dorothy Fuller to testify that the holes in the

victim's T-shirt were consistent with a contact shot, Counsel testified as follows:

. . . I would like to have that information in from a State's witness. I did not have a defense witness that I could put it in with other than calling this SLED agent which would basically, she would have testified that Dr. Sexton is a medical doctor, and that he examined the body, not the shirt. And she wouldn't argue with Dr. Sexton. . . . I could have put her up. She is a SLED agent. She would have had an evidentiary harpoon loaded. I don't know if you've ever tried a murder case but you don't put SLED agents up in your direct testimony if you can avoid it at all. They're prepared to hurt you.

App. p. 597.

The PCR Judge held the following:

One has to go no further than the cross examination of the Lexington County

32

deputies to verify trial counsel's assertions that it would be a tactical blunder to call as defense witnesses those people who were involved in the State's investigation in this case. Trial counsel testified credibly at the PCR hearing that it would be a huge mistake to put such a witness on the stand to try to elicit one thing that might be favorable to his client, because that witness would be predisposed to try to convict his client and would take that opportunity not only to put an unfavorable spin on the helpful matters, but also to tell the jury about other unfavorable things.

(App. p. 692).

The state PCR court's findings are not contrary to clearly established federal law or an unreasonable determination of the facts in light of the evidence in the state court proceedings. Counsel testified to his reasons for this strategy and the PCR court found him credible. Courts are instructed not to second guess an attorney's trial strategy and tactics. Goodson v. United States, 564 F.2d 1071, 1072 (4th Cir.1977); Stamper v. Muncie, 844 F.2d 170 (4th Cir.1991). Counsel cannot be judged ineffective for performing in a particular way in a case, as long as the approach taken "might be considered sound trial strategy." Darden v.Wainwright, 477 U.S. 168, 169, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Petitioner provides no evidence of how this action was anything other than "sound trial strategy," and has failed to establish resulting prejudice. Therefore, it is recommended that Respondent's motion for summary judgment be granted with respect to Issue Two.

**ISSUE III**:

In the third issue, Petitioner argues the following: "Did the PCR judge err in finding that trial counsel's failure to present in evidence the 911 tape of Golson's call for help after the shooting was not ineffective assistance of counsel on the basis of his finding that the decision was a tactical decision which was 'adequately explained.'"  (Petition). Respondent argues that the state court's

factual findings are not objectively unreasonable under 2254(d)(2) and the state courts' rejection was not "contrary to" and did not involve an unreasonable application of clearly established United States Supreme Court precedent under 2254(d)(1).

> The PCR court found trial counsel credible and held the following with regard to this issue:
>
>> The failure to produce the 911 tape was adequately explained. It was a tactical decision. Another attorney may have chosen differently, but that does not establish ineffective assistance of counsel.

App. pp. 554-56.

The state PCR court's findings are not contrary to clearly established federal law or an unreasonable determination of the facts in light of the evidence in the state court proceedings. Trial counsel testified that it was trial strategy not to produce the 911 tape. Counsel testified he had listened to the 911 tape and "it was not something that I felt really would be that germane." Counsel testified that "everybody agreed Joe made the call. I mean, that wasn't an issue. He said it was an accident. So that was really not an issue," and the State admitted Petitioner made the call. (App. pp. 554-56). Counsel testified to his reasons for this strategy and the PCR court found him credible. Courts are instructed not to second guess an attorney's trial strategy and tactics. Goodson v. United States, 564 F.2d 1071, 1072 (4th Cir.1977); Stamper v. Muncie, 844 F.2d 170 (4th Cir.1991). Counsel cannot be judged ineffective for performing in a particular way in a case, as long as the approach taken "might be considered sound trial strategy." Darden v. Wainwright, 477 U.S. 168, 169, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Petitioner provides no evidence of how this action was anything other than "sound trial strategy," and has failed to establish resulting prejudice. Therefore, it is recommended that Respondent's motion for summary judgment be granted with respect to Issue Three.

**ISSUE IV**.

In Issue IV, Petitioner asserts counsel was ineffective in his "failure to have a working knowledge of Golson's version of events and his inclusion in his opening statement of statements of fact contrary to Golson's version but confirming the State's theory before the jury." (Petition). Respondent argues that state PCR court's findings are not objectively unreasonable and not "contrary to" and did not involve an "unreasonable application of" clearly established United States Supreme Court precedent.

Specifically, Petitioner alleges trial counsel made several misstatements in his opening remarks which contradicted Petitioner's version of the events, bolstered the prosecution theory, prejudiced Petitioner, and damaged Petitioner's credibility. First, Petitioner alleges counsel erred in his opening by stating that "Mr. Golson then took her from where she was on the floor and put her up on the head of the bed." (App. p. 87). However, Petitioner asserts he did not testify to this at trial but testified that the victim fell across the bed after the shot and he repositioned her to place her head on the pillow and cover her with the comforter.[8]

At PCR, trial counsel testified that when he and Petitioner originally talked, Petitioner told counsel they were away from the bed and he picked her up and put her up at the head of the bed after she fell on the floor when the gun went off. (App. 560-561). The PCR court held:

---

[8] During the cross-examination of Petitioner, trial counsel objected to the prosecution asserting that Counsel said in opening that she was on the floor and Petitioner picked her up. At this point, the trial judge gave a curative instruction to the jury stating, ". . . you are the judges of the facts in this case. As I told you when the case started, what the lawyers say in their opening statements and closing arguments is not evidence in this case. You are the judges of all of that. So please, you will recall what has been said." (App. p. 361, lines 4-10). At this point, the prosecution asked Petitioner if he picked her up off of the floor and he responded, "[n]o, she fell on the bed." (App. p. 361, Lines 12-13).

As to the challenges related to counsel's performance during the trial, the court has carefully reviewed the record and determined that counsel's performance was well within the range of reasonable representation. He provided effective assistance concerning how and why he presented evidence, as well as how and why he attacked the State's presentation of evidence. His testimony about tactical decision that he made was reasonable and credible.

(App. p. 690).

Petitioner also alleges that Counsel erred in stating that "when he went back over there, Mrs. McIver was not home and that he waited on her." Petitioner asserts that Counsel stated he was waiting inside the home for the victim when Petitioner testified that the victim was already home and let him in after knocking. At the PCR hearing, Counsel testified that he did not say he [Petitioner] was waiting inside. (App. p. 556). A review of the trial transcript reveals counsel stated, "[t]he evidence is going to show that when he went back over there, Mrs. McIver was not home and that he waited on her." (App.p. 85).

Also, Petitioner alleges Counsel erred by stating in his opening that "the phone call took place just as the Solicitor said, and there was nothing to be concerned about. Mrs. McIver did not say he was upset, and she didn't call for help." (App. p. 85). In the opening statement by the prosecution, the jury was told that victim's friend, Billie Jean Elmore, received a call a little after midnight from the victim stating that Petitioner was there waiting on her and to "[p]lease tell him I was at dinner with you" and Ms. Edwards hears Petitioner state in the background "Don't worry. She is just going to lie for you anyway. They talk for a little bit . . . " and then they hang up after stating they would talk the next day. (App. p. 80). During the trial, Petitioner testified that he was in the bathroom when Ms. Elmore called, and he only commented with regard to Elmore's problems with her washing machine.

At PCR, Counsel testified that the basic point of that statement was that the phone call was

made and there was nothing to be concerned about the phone call, no malice or anger and nothing was wrong at the time of the phone call. (App. pp. 556-560). The PCR court found as follows:

> . . . Concerning the phone call that the victim made to Ms. Billie Elmore, which the State used as evidence about a dispute between the applicant and the victim–as well as evidence of jealousy and perhaps lying in wait–trial counsel got Ms. Elmore to characterize the phone call as a routine type of call-normal event and not a cause for alarm.

App. p. 691.

Within this issue, Petitioner also alleges Counsel was ineffective by not reviewing the crime scene photographs with him. Petitioner asserts that some of the photographs showed a black bag and he could have told Counsel the black bag was being used to pack his clothes which supported his testimony that he had gone there to break it off with the victim. Therefore, Petitioner asserts Counsel erred by failing to contest the prosecution's reference to a black bag as a "purse" when it was really a travel bag Petitioner was using to pack his clothes.[9] At the PCR hearing, Counsel testified that he had shown a number of photographs to the Petitioner but could not remember exactly which photograph he showed Petitioner but stated he "[v]ery well could have. " (App. p. 564). Counsel also testified that he could not remember after seven years whether or not he thought it was a purse by looking at the photographs. (App. p. 564). Counsel testified that looking at the picture at the time of the PCR hearing whether or not he thought it looked like a purse or not, "I couldn't tell you. It's dark.  It's not a very good picture. I couldn't tell you what it is . . .  It could be a small black travel bag. It could be a purse. I can't tell you what it is." (App. p. 564).  The following colloquy took place:

---

[9] At trial, Petitioner testified that he had been over all the discovery in the case with his attorney provided by the prosecution. (App. p. 354, lines 14-17).

Q:    Do you think it would have been important to Joseph's case for that bag to have been obtained, for someone to actually look in it and determine if it was a clothing bag and not a purse belonging to the deceased?

A:    If Joseph Goldman [sic] had told me that that was a black bag that he had packed with clothes, then I would have sought it. Joseph Goldman [sic] did not tell me that that in that picture was black bag that he got clothes and put into.

Q:     And when you looked at the picture, you just assumed that it was a purse?

A:    I didn't assume that it was necessarily anything, but I had no reason to think it was anything other than a purse. Mr. Goldman [sic] never told me that was a black bag that he packed clothes into. There is some evidence it was not a purse?

Q:    Well, other than the photographs and the crime scene videotape which depicts, you know, pretty much the same thing as the photographs do, and his testimony that he put clothing in a black travel bag. That's the important part.

A:    And I guess, number one, he never told me that was a black travel bag. And I haven't found many officers that would label a black travel bag as a purse.

(App. pp. 568-569).

The PCR court held as follows with regard to this issue:

He did conduct a vigorous cross examination, and on numerous occasions he elicited information from the State's witnesses that was helpful to his client. For example he had them testify that the applicant did not run away, but actually retrieved his truck and drove back to the scene. He had them testify about evidence found at the scene, such as unspent cartridges, that tended to corroborate his client's version of events. He did not know about the applicant's clothes being in the bag that was in the picture, and the client never told him that the bag was his suitcase. Counsel's conduct related to that item was reasonable . . .

(App. p. 691).

38

Petitioner also asserts Counsel was ineffective when he questioned Petitioner on redirect examination by asking "And did you have any intention of pulling that trigger when it went off?" (App. p. 366). Petitioner asserts there was no testimony from him on direct that he ever pulled the trigger. At the PCR hearing, Counsel testified when asked what was he thinking when he asked Petitioner that question on re-direct:

> I was trying to point out that Joe had no intention of pulling the trigger. I did not say, did you pull the trigger. The gun went off. That's why I said, did you have any intention of pulling that trigger when it went off . . .  That question does not say that he did pull the trigger . . .  It's not the intent of that question at all. And the other thing you'll have to do is basically, I mean, this is cold record. When you're in the courtroom things are different when people are around, listening. But that's not the intent of that question at all. It does not say that he pulled the trigger.

(App. pp. 586-587).

The PCR held:

> As to the challenges related to counsel's performance during the trial, the court has carefully reviewed the record and determined that counsel's performance was well within the range of reasonable representation. He provided effective assistance concerning how and why he presented evidence, as well as how and why he attacked the State's presentation of evidence. His testimony about tactical decision that he made was reasonable and credible.

(App. p. 690).

The PCR court's rejection of the ineffective assistance of counsel ground for relief with regard to Issue IV was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(1), (2); Williams, supra. Thus, the undersigned

recommends that the Respondent's motion for summary judgment be granted on these issues.

**ISSUE V**.

In Issue V, Petitioner asserts that the PCR judge erred in finding that "trial counsel was not ineffective in failing to prepare Golson to testify regarding his taped statements and further ineffective in failing to present Golson's statements in context during his direct examination." (Petition).

The PCR court held the following with regard to this issue:

> It is unethical to coach a witness. Trial counsel testified that he spent probably 7 hours going over the court proceedings, including mock questioning. He testified that he shared discovery materials with his client. An investigator was used. Trial counsel's testimony about how he prepared his client and his case was far above the norm, and it was credible. As for the assertion that the client was not prepared to address what occurred at the scene, he was there at the scene when the shooting occurred, he knows what happened better than anyone, and he was the best equipped to deliver that information. In fact, he testified well. The jury chose not to believe him. An assertion that he was ambushed by what was contained on the audio captured while he was sitting in the patrol car is simply not credible. There was discussion about all of that earlier in the proceedings, and the court finds trial counsel's assertions that he discussed that with his client to be credible.

 App. p. 693.

The PCR court's rejection of the ineffective assistance of counsel ground for relief was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(1), (2); Williams, supra.   Thus, the undersigned recommends that the Respondent's motion for summary judgment be granted on this issue.

**ISSUE VI**

In Issue VI, Petitioner asserts counsel was ineffective because Counsel failed to object to the "misstatements of the evidence" by the Solicitor during closing remarks. Specifically, Petitioner asserts the Solicitor stated in his closing argument that Eddie Hayden testified Petitioner called him "like he was all out of breath," when he did not testify as such. Respondent argues this issue should be dismissed.

The PCR court did not directly address this issue. However, the PCR court found that "[a]s to the challenges related to counsel's performance was well within the range of reasonable representation." (App. p. 691). The PCR judge also found that nothing in the conduct of the trial would give rise to granting the PCR application as "[t]rial counsel's performance was not deficient." (App. p. 693).

The PCR court's rejection of the ineffective assistance of counsel ground for relief was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(1), (2); Williams, supra.

If no improper closing argument exists, then Trial Counsel cannot have given ineffective assistance of counsel by failing to object to it; the court therefore begins by looking at whether prosecutorial misconduct exists. Yaitsky v. U.S., 2008 WL 3845446 (D.S.C. Aug. 18, 2008) *citing* Moore v. U.S. (Moore I), 934 F.Supp. 724, 727 (E.D.Va.1996) ("Because the trigger for an ineffective assistance claim is an unprofessional error or mistake by counsel, the Strickland analysis of the claim properly begins with the identification of the error or mistake."). A petitioner is not

entitled to relief based upon the closing argument of a prosecutor, unless that argument so infected the trial with unfairness as to make the resulting conviction a denial of due process. Donnelly v. Dechrisstoforo, 416 U.S. 637 (1974). Assuming that the comments were improper and an objection should have been made, the Petitioner still has not shown that he is entitled to relief on this claim, as he has failed to show the requisite prejudice. When considering whether comments by a prosecutor were so improper as to warrant relief, "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ( quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "Moreover, the appropriate standard of review for such a claim on a writ of habeas corpus is the 'narrow one of due process, and not the broad exercise of supervisory power.' " Darden, 477 U.S. at 181, 106 S.Ct. 2464 ( quoting Donnelly, 416 U.S. at 642, 94 S.Ct. 1868). The standard in Donnelly is a very high standard. Comments which are undesirable or even "universally condemned" are not alone enough to warrant reversal. Darden, 477 U.S. at 180-81, 106 S.Ct. 2464; see also Donnelly, 416 U.S. at 643, 94 S.Ct. 1868.  In this case, the witness, Hayden, did in fact testify that " . . . I get phone call from Bubba (Petitioner) asking me if it was all right if he left his truck down there for a while. He said there was some things going on at the time. I could pretty much tell by his voice there something wrong. I just didn't know what it was." (App. pp. 117-118). Therefore, even though the Solicitor made a misstatement of Hayden's testimony, Petitioner has failed to show that this misstatement so infected the trial that it was prejudicial.

Petitioner has failed to show that Counsel's failure to object was not unreasonable under Strickland. Petitioner had failed to show that the comments in the closing argument so infected the

trial as to make it unfair. Additionally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . " Strickland, 466 U.S. at 689. Additionally, a jury is presumed to follow the instructions given by the trial judge. Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727 (2000).  The trial judge in this case instructed the jury to go by their determination of the evidence and facts in the case not what the attorneys said in opening or closing. The jury heard Hayden testify. The state court's decision finding no prejudice based on the overwhelming evidence of guilt and denying Petitioner's claim is entitled to deference, and Petitioner has failed to satisfy his burden to show prejudice under Strickland. Although Petitioner speculates that the outcome may have been different if his counsel had objected, he has produced no evidence to support his assertions, nor has it been shown that an objection by Counsel to the Solicitor's remarks in his closing argument would have affected the outcome in this case. Bradford v. Whitley, 953 F.2d 1008, 1012 (5th Cir.1989) [Speculation and conjecture does not satisfy the prejudice prong of Strickland ]. Accordingly, Petitioner has failed to show that the state court's rejection of this claim was unreasonable.

Therefore, the state court's decision was not contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, it is recommended that the Respondent's motion for summary judgment be granted with regard to this issue.

**ISSUE VII**

In Issue VII, Petitioner asserts that the PCR judge erred in failing to find that trial counsel was ineffective in failing to argue to the jury that, if not an accident, the evidence supported a finding of involuntary manslaughter. Respondent argues this issue should be denied and dismissed.

Trial counsel requested a charge on the lesser-included offense of involuntary manslaughter

43

over the State's objection but did not request the lesser-included offense in his closing argument.

At the PCR hearing, trial counsel testified he did not argue for an involuntary manslaughter verdict because Petitioner's defense was that it was an accident. (App. pp. 613-614). Trial Counsel testified that if he argued Involuntary Manslaughter, it would be like asking the jury to come back and convict Petitioner of that offense.  Trial Counsel testified that it is "my personal preference, in fact, years of experience is not to spend time engaged in something that's a lesser included that is a possibility of it's their forum. My experience even in focus groups is they will go back there and they will discuss it anyway but if I go in and say that was an accident, however but, that they will sometimes even say things like, well, you know, even the lawyer knows it was at least involuntary manslaughter."  (App. p. 615). Trial counsel further testified that studies he has reviewed show that " . . . the more I basically argue a point as an if-or, that the jury takes it as whatever the crime is, involuntary, that I'm agreeing to that."  (App. p. 615).

A review of the PCR court's Order of Dismissal reveals the PCR judge held the following with regard to this issue:

> As for the failure to argue for a verdict of guilty as to the lesser-included offense of involuntary manslaughter, trial counsel advanced a reasonable tactical choice. The jury knew that it had that option. Counsel testified at the PCR hearing that he believed that arguing to the jury that it should find the less-included offense would diminish and undermine his argument that the shooting was accidental. That was the focal point of his case, and he was concerned that any argument about finding the applicant guilty of a lesser-included offense would have been interpreted by at least some of the jurors as an admission that the attorney knew his client was guilty of some crime.

(App. p. 693).

The PCR court's rejection of the ineffective assistance of counsel ground for relief was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as

44

determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(1), (2); <u>Williams, supra</u>. Counsel testified to his reasons for this strategy and the PCR court found him credible. Courts are instructed not to second guess an attorney's trial strategy and tactics. <u>Goodson v. United States</u>, 564 F.2d 1071, 1072 (4th Cir.1977); <u>Stamper v. Muncie</u>, 844 F.2d 170 (4th Cir.1991). Counsel cannot be judged ineffective for performing in a particular way in a case, as long as the approach taken "might be considered sound trial strategy." <u>Darden v.Wainwright</u>, 477 U.S. 168, 169, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). A presumption of correctness attaches to state court factual findings. 28 U.S.C. §2244(e)(1). <u>Evans v. Smith</u>, <u>supra</u>; <u>Wilson v. Moore</u>, <u>supra</u>. The state PCR court's findings of fact are not only entitled to the presumption of correctness, 28 U.S.C. § 2254(e)(1), but also are supported by the record. Petitioner provides no evidence of how this action was anything other than "sound trial strategy," and has failed to establish resulting prejudice. Thus, the undersigned recommends that the Respondent's motion for summary judgment be granted on Issue VII.

<u>**CONCLUSION**</u>

Based on the above reasoning, it is RECOMMENDED that Respondent's motion for summary judgment (docket entry #) be GRANTED and the Petitioner's Petition for Writ of Habeas Corpus be denied, and the petition dismissed without an evidentiary hearing.

Respectfully Submitted,

s/Thomas E. Rogers, III

Thomas E. Rogers, III

February 2, 2012                                   United States Magistrate Judge

Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**